2-22-0450 People of the State of Illinois plaintiff Appellee v. Christopher J. Gerken defended the appellant. Arguing on behalf of the appellant, Ms. Catherine Donohoe. Arguing on behalf of the appellee, Ms. Katrina M. Coon. Justice Jorgensen, are you with us? As I think you can figure out we have Justice Jorgensen coming in remotely today as well. It's a true hybrid. It's a hybrid hybrid. It's like double hearsay. Ms. Donohoe, I hope you're feeling well enough to be with us this morning. Yes, I am. But thank you. I really want to thank the court for granting my request to argue remotely on short notice. And I also appreciate that counsel had no objection. But we would like to find Justice Jorgensen. We had problems in the first one. And I'll just tell you it was interesting. The two attorneys are answering her question, but they're looking kind of at the ceiling. I don't know where she is because she couldn't get her picture up. She was talking. And so they're like, where did he go? And I was just looking over there and she wasn't there. It does create an interesting issue when the person is physically not there. The second one went without a hitch. We were all in the same general vicinity. Thank you.  I'll go up and call him. Thank you. Is it storming now? I don't know. They didn't say it was raining. I didn't hear anything else. I don't know how quickly it says that she's here. It says that she's signed up. She's able to participate. She just has her turn on her camera. Oh, there we go. I'm here. I'm waiting for you guys. Well, we asked where you were a little bit ago. And now it says Ann's iPad is talking. So I guess we have you talking. And now we'll get Justice Shostak back in and the clerk. Oh, there you are. All right. Your Honors, the final case on the docket this morning is 2-22-0450, People of the State of Illinois Plaintiff Appellee v. Christopher J. Durkin, Defendant Appellant. Arguing on behalf of the appellant, Ms. Katherine Donovan, arguing on behalf of the appellee, Ms. Katrina Ann Kruger. Thank you, counsel, for your waiting with us here. And we will now proceed. So, Ms. Donovan, whenever you're ready, you may start. Good morning, Your Honors. I am here on behalf of the appellant, Christopher Durkin. I'm from the Office of the State Appellant Defender. And Mr. Durkin appeals the first-stage summary dismissal of his post-conviction petition. At his murder trial, the jury was instructed on self-defense and second-degree murder. And the resolution of this case turned on the credibility of Mr. Durkin, who testified to facts supporting self-defense or second-degree murder, and Trevor Motzner, who the state used to present its case for a first-degree murder. In his pro se petition, Mr. Durkin alleged that his trial counsel was ineffective for failing to request that the jury receive IPI 3.17, which is also known as the accomplice witness instruction. And the purpose of that instruction is to advise a jury that a witness involved in a crime with a defendant may have a strong motivation to falsely accuse the defendant. Specifically, it instructs the jury, when a witness says he was involved in a commission of a crime with a defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. Was he found to have participated in that crime? Was he charged? Mr. Motzner, related to this case, pleaded guilty to a drug offense and was sentenced to probation. And so the plain language of IPI 3.17 says that when a witness says he was involved in a commission of a crime with a defendant, it applies. And he clearly, by his testimony, was involved in a drug transaction with Mr. Durkin a week before Mr. Clark was killed, and also he set up this exchange that was supposed to happen the night that Mr. Clark was killed. You're asking for an accomplice instruction on a murder charge, not on a drug charge. Is that correct? Well, it's a little bit more nuanced than that because we do argue that he participated in Mr. Durkin's conduct related to the murder. It's also important to note that Mr. Durkin was also tried for aggravated discharge of a weapon, and Mr. Motzner knew that he had a firearm and knew that he walked up the driveway carrying it with the possible intent to use it to rob or shoot the victim. Now, he said, I believe he said that Mr. Durkin said, I just want to scare him or I just want to, you know, let him know I'm in business generally. He never said he was going to shoot him. And that's Mr. Motzner's, according to my recollection, that's Mr. Motzner's description of what Mr. Durkin said. But Mr. Motzner testified that he believed Mr. Durkin was going to rob or possibly shoot Mr. Clark because of this dispute about the prior drug transaction where Mr. Durkin believed that Mr. Clark had shorted him and he wanted to be made whole with additional drugs for paying less money for the next transaction. But does that make him then an accomplice, rather, in the murder? He wasn't charged with murder in this case. But under the law, he didn't need to plan on killing Mr. Clark. So there was a recent Illinois Supreme Court case that was not included in the briefing, but just in 2021, People v. Fane kind of shows that IPI 3.17 is a little bit broader than just, you know, the accomplice witness was, you know, admitting he was involved in the specific crime of the trial. And that case is a different context because in that case, the accomplice witness was actually presented by the defense and the state wanted to use IPI 3.17, and the defense challenged that. But in the course of discussing when 3.17 should be used, the Illinois Supreme Court talked about the defendant and the witness being associated with another in the commission of a crime. And clearly, Mr. Motzinger was associated with this crime. We can look at the common design rule of accountability. But by his own testimony, Mr. Motzinger said, hey, you know, listen, he lives in there with his girlfriend and her child, and the child is known to sleep in the living room. You can't be shooting anybody. I mean, and so he told him that that was not the plan, correct? Well, the plan, however, was to go engage in this drug transaction with a gun. And Mr. Motzinger already knew all of this in the car. He walked up the driveway with Mr. Gerken. He actually sent a follow-up text message to Mr. Clark, telling him to come out of the house to meet them, that they were arriving. And he didn't warn Mr. Clark that there was a gun. He would have had to have terminated his participation at that point for there to be no question that he was accountable. But I would also like to reiterate. How would he accomplish that termination? He was in text communication with Mr. Clark. He could have warned Mr. Clark. Instead, he proceeded as planned to arrange this meeting between Mr. Gerken and Mr. Clark at Mr. Clark's home. And we had Mr. Clark's girlfriend through the window, saw Mr. Clark talking to Mr. Motzinger through the window, telling him to come up to the house and meet him. And Mr. Motzinger never tried to terminate his participation in this. I'd also like to remind what he did. He did suggest to Mr. Gerken that he stay down below. Why don't you just wait there? And he did. And it was Mr. Clark who said he should come on up, right? Well, but at that point, even once Mr. Motzinger started walking up the driveway with Mr. Gerken, he was bringing Mr. Gerken up to the house. And he didn't try to, he did not. He wasn't holding his hand to bring him up to the house. They were coming up for a drug transaction, correct? He didn't have an obligation to stop Mr. Gerken from doing what he was going to do, but he had to terminate his own participation. He could have just walked away. He could have left. But notably, he helped continue on with the plan because he sent follow-up text messages to Mr. Clark telling him that they were there and they were ready for this transaction, knowing all the while that Mr. Gerken had a gun and that he wanted what he believed was owed to him that Mr. Clark had specifically refused to give him. Ms. Donahoe, your client filed a direct appeal, did he not? He did. And in the direct appeal, did he raise this issue? He did not raise this issue. So why is it not forfeited? And so we're arguing that appellate counsel was ineffective for failing to include this claim in the direct appeal. And the state has argued that because he hasn't included that specific allegation in the petition, that he forfeited this argument, that he should have included in his petition appellate counsel's ineffectiveness. So you're looking at plain error? We're not looking at plain error. We're arguing that at the very low threshold of the first stage, he's not required to provide a fully stated claim and that what he did include is enough detail to get to the second stage and at that point he would be entitled to the appointment of counsel and he could file an amended petition fully stating this claim. And this is really a procedural argument that the state is making. The crux of his claim has to do with the accomplice witness instruction and trial counsel's failure to ask for it, even though he argued to the jury that they shouldn't believe Motzinger because he was responsible for setting up the transaction that led to Clark's death. But not he was responsible. There's no question that he was responsible for setting up the transaction. We know that. I mean, that wasn't hidden. That was the deal. And he had done it previously. The issue, though, is how is he in any way responsible or of suspicion, as you've said, in the murder? Well, under the common design rule of accountability, he didn't have to share Mr. Gerken's intent that night. When an individual intentionally sets out to promote or facilitate the commission of a crime, which he clearly did, he's legally responsible for any criminal act done in furtherance of the planned act. And this means that he's legally accountable for the conduct of the person he was aiding, which in this case was Mr. Gerken. And I'd also like to reiterate, Mr. Gerken wasn't just tried for murder. He was also tried for aggravated discharge of a firearm. And so there's no question that Mr. Motzinger knew that Mr. Gerken was walking up there with a firearm, at minimum stating that he was going to scare Clark, which would encompass aggravated discharge of a firearm. He voluntarily attached himself to Gerken's conduct that night, and he never he could have walked away. All right. Counsel, the state raises a case that you do not respond to in your reply brief, and that is People v. Quesada, which was decided in this particular district and seems to, even though it came before your case, is a very good roadmap for what is an accomplice instruction and when should it be given. Do you want to respond to that now? It is on appeal to the Supreme Court, but this particular issue of accomplice instruction is the only one that has not been appealed or wasn't reversed by this court and is not likely, based upon the things that you can find on the Internet in terms of the website, is not part or not a contention in this appeal to the Supreme Court. So why did you not respond to that? I'll take a closer look at that, but my understanding was that the state was trying to draw a comparison that Mr. Motzinger was merely present for the events that transpired beyond the drug transaction, which our position is that he did not participate because he had plans, he facilitated the drug transaction and went along with the plans even as he saw what Mr. Gerken was proceeding to do. And I would also again point back to this People v. Fain case from the Illinois Supreme Court where the defendant, the big charges against the defendant in that case were home invasion, residential burglary, and in that case the Illinois Supreme Court approved the use of this instruction where an accomplice witness was associated with just the resisting arrest charge that the defendant was also charged with because he was present and the accomplice witness was actually standing out in the open in a field while the defendant was trying to hide. And so even in that case, he was still allowed to have this accomplice instruction used to contest his position on it. One bit of language in Quesada is something that I know Ms. Kuhn is going to probably talk about, but the evidence must show that there is probable cause to disapprove of the crime, but that he participated in the planning or commission. And so how does that particularly relate to your situation here or Mr. Gerken's situation? So I think that a distinction here is that Mr. Motzinger did have some criminal liability at stake here for his involvement in all of this because he wasn't just merely present. He facilitated the drug transaction and he immediately lied. As soon as Mr. Gerken left the scene, he took drugs and money from the victim and hid it in the house and then he got caught by the police trying to recover it. He repeatedly lied to the police. He was liable for the plan and Mr. Gerken's conduct that followed from that plan. He never terminated his participation. He wasn't like Mr. Clark's girlfriend, just merely present in the house. He was a player in everything that took place. And the police have been instructed that they were required to view his testimony with suspicion and caution. And that isn't... Ms. Donohoe, what year was the Fame case that you're relying on? It's 2021, Illinois, 126715. And it wasn't discussed in the brief because it's not the same issue, but I'd be happy to provide additional briefing. Give me that site again. 2021. Illinois, 126715. And Fame is spelled F-A-N-E. In that case, the defendant and the accomplice witness fled from a home invasion. And the accomplice witness was... And this IPI 3.17 applied to that accomplice witness testimony, even though he was called by the defendant. And even though the connection for him, as far as the charges were concerned, was that he was associated with the resisting arrest offense, because they were both discovered in the same area. And I see that my time is up, but I did just want to briefly reiterate that this is the first stage post-conviction petition. And so this doesn't need to be a fully stated claim. It just needs to be arguable. And it's not an indisputably meritless legal theory. It's not a fanciful factual allegation. And the issue related to alleging appellate counsel's ineffectiveness can be addressed at the second stage. Thank you. I do have one question that reflates to the briefing. When you wrote your initial brief, you have not requested oral argument. We're obviously here today because we're having oral argument, but you don't request it until the reply brief. Is there a reason for that? That was a clerical oversight, Your Honors. Okay. I appreciate that. It happens. Any other questions from my colleagues? None at this time. Thank you. All right. Ms. Kuhn, you may proceed. Good morning, Your Honors. Good morning, Counsel. Good morning. Katrina Kuhn for the people of the State of Illinois. May it please the Court. Going to the merits of the issue, there's a lot to discuss based on the argument. First, before I forget, if Your Honors would be considering Fain, people would appreciate the opportunity to reply or supplementary brief. I think it wasn't listed in her brochure. No, Your Honor, it wasn't. Just to point out that we would if you would like additional briefing, we would be willing to get our point. And both of you recognize that we periodically find cases that you do not, and we have a precedent you wish, but if you would like argument about it, we'd be happy to supplementary brief. When you cited Visoda. Visada. Visada. She didn't respond to that in her reply brief, correct? I believe so. I believe you're correct. All right. I want to point out that a lot of the discussion opposing counsel was using the point of participating in the planning of the commission or the Illinois, the pattern instruction language of involved in the commission of the crime. Moczner was involved in the commission of the crime of planning the crime of the drug transaction. Counsel seems to implicitly, you know, argue that it implicitly includes the shooting. It does not. That's a very broad definition of the crime. It's not as nuanced as counsel makes it appear to be. This was a dispute between Clark and the defendant. And Mr. Moczner, as Your Honor noted in your direct appeal, was a middleman. He was the middleman. He was facilitating the transaction. Mr. Moczner did not share in the criminal objective of the defendant. The defendant expressly testified, I needed Moczner to get drugs for me. That was Moczner's role. As Your Honors have noted, there was a previous transaction a week before. And after that transaction, the defendant accused Moczner of taking some of the drugs for himself and making it to be kind of a short amount and was saying, well, that's on you, meaning Moczner, or it's on Clark, the drug supplier. Moczner then set up the second meeting. Defendant initiated it because he thought there was a short on the first sale. And again, as Your Honors have noted, the defendant, pardon me, the defendant displayed a gun and Mr. Moczner thought that he was going to shoot or rob him. Defendant then assured Mr. Moczner, oh, I just want to scare him. There was this dispute about the previous transaction. There was no discussion, no planning. The fact that Mr. Moczner was there does not make him, you know, mean that he participated in the planning or commission. He could not have been an accomplice simply because their interests were not aligned. Mr. Moczner's interest was in completing the drug transaction, getting paid. Defendant and Mr. Moczner certainly were not on the same team. Mr. Moczner, not only is this claim indisputably meritless, it's an indisputably meritless legal theory, not only because it's contradicted by the record and by everything we've talked about, also because defendant in his own testimony said he shot in self-defense. How could Mr. Moczner be an accomplice to self-defense? And self-defense will happen at the spur of the moment. You can't plan to be, you know, agree to a shooting that occurs in self-defense. This simply is not legally logical. Now, I just am curious, what about the fact that Mr. Moczner does everything he possibly can, including lying to the police about who Mr. Gerken is, and he clearly knew who Mr. Gerken was? Yes, well, he did. He knew that Mr. Gerken was a drug purchaser. Mr. Moczner wanted to, you know, in hiding the money and the cocaine and putting items on the back porch and making a 911 call, Moczner was not seeking to aid defendant. He was seeking to help Clark, you know, who had been mortally wounded. Yeah, but when the cops came, he sent them the wrong way. He did. I mean, Mr. Moczner was trying to conceal the fact that there was a drug transaction taking place. He wasn't necessarily trying to help defendant. His interests were not aligned in helping defendant. I think he gave the dispatcher the false information because he feared that there would be retribution for the defendant. This is a defendant who had a gun and just shot someone. He didn't want to be identifying him and placing himself in harm's way. So he was not, he really did nothing to help defendant. He was simply trying to get them off the scent of the drug transaction. He was trying to help himself. He was trying to help himself and he was trying to, you know, hiding the fact, the hiding of the items, you know, benefits Moczner and Clark because they're hiding the fact that there's an illegal, you know, transaction going on here. And this is all, you know, very spur of the moment. But doesn't that also help the defendant? I mean, sending the police in the wrong direction, hiding any evidence that the defendant was involved in any kind of a drug transaction. So how do we nuance the two? Well, we nuanced the two because there was another reason why Mr. Moczner would have tried to throw the police off the scent and wouldn't have immediately pointed to the defendant. I appreciate that because you had just said that. But here's my point. It says that you get the benefit, the defendant in the commission of a crime. Well, but in order for us to get to that point, Your Honor, we would have to be agreeing or accepting that Mr. Moczner was involved in the planning and participation and commission of the shooting itself. And this is all, these are all events that occurred after the shooting took place. I mean, so your question, I believe, presumes that Mr. Moczner was already in, so to speak, on the shooting part. These, you know, these... Right, but he was in on the drug delivery. He wasn't on the drug delivery, but yes, Kazeta points out, and as we've discussed, the test is whether he was participating in the planning and commission of the shooting, the shooting itself and not the drug delivery. The drug delivery is, you know, there's no question he was participating, you know, in the drug delivery, the drug transaction. What about the aggravated discharge of a firearm? Well, again, Mr. Defendant specifically assured Mr. Moczner as they walked up to the door, I'm just only going to scare him. Mr. Moczner had no reason to believe that a weapon would be discharged. And, you know, my opposing counsel spoke about the text message at the front door. Mr. Moczner was simply, those were simply logistical details, letting Mr. Clark know that he's there. I believe Mr. Moczner testified, I didn't knock on the door, I knew that there was a child and a young woman inside, so I was texting Mr. Clark to let him know that we were present. There weren't any kind of, it wasn't any kind of, there wasn't really anything else involved in that. And so I believe Ms. Donahoe referred to Mr. Moczner as a player, a player or an actor in these events does not equal being an accomplice. And that's really what it boils down to, the fact that there is no, there is not a hint of a meritless legal theory, a meritorious legal theory here, and that is what defendant's entire argument should fall upon. And how did Mr. Erkin finally get up to the porch? Because he was standing down below for a little bit of time. I believe Mr. Moczner testified that when he was, Mr. Moczner testified that the defendant was standing at the foot of the stairs. And Mr., and the defendant gave an entirely different version of events in which defendant was sitting on the porch and he and Clark were arguing amongst themselves and the jury could decide what was, you know, what was the more believable occurrence. However, there is no question that defendant's testimony, the act of self-defense should be rejected because there was evidence that a bullet went through a door, meaning that Clark was trying to shut the door on him. Mr. Moczner never saw a weapon in Mr. Clark's hand. Mr. Moczner said that they were fighting over something, they were grappling over something, which was defendant's weapon. And so the entire version of events in which Clark has a weapon is entirely, you know, defendant's own, you know, is defendant's statement, which was rejected by the jury. Defendant was more aligned with Clark than he was Gerken, correct? Yes, yes, yes. They were, Mr. Moczner made his money and made money off the transactions. Mr. Moczner certainly would want to rush to Clark's aid. You know, he was, he was, yes, he definitely was, why would Moczner want to side with defendant? He certainly had no interest, you know, aligned with defendant. He was trying to set up the transaction and get out of there. And defendant was the one who, you know, unilaterally brought a weapon and unilaterally decided to conduct a, you know, to shoot the victim. Now, let me ask you about the forfeiture or your argument on forfeiture. We often have, well, let me start with this. Counsel has argued that had this gotten past first stage, the counsel appointed could have brought this claim of appellate counsel not raising the ineffectiveness of trial counsel. But that's not what we have here. We have one step beyond that. We have nothing, we didn't get to second stage. And instead we have appellate counsel raising another appellate counsel's ineffectiveness for not, it's a very different situation. Would it be the same, same analysis though, even though it's a different situation? The defendant has the ability to raise a claim of appellate counsel in his petition. The defendant filed a petition, albeit pro se. He filed a petition with ten claims in it that was ten pages long. It had several claims of trial counsel's ineffectiveness. And the fact that he, the fact that appellate counsel is now raising this for the first time and conceded in the brief, you know, on page 17 of defendant's brief, she concedes that the claim is not fully stated. She agrees on page 3 of the reply brief that it's not fully stated. And there has to be some standard that, you know, Hodges at the first stage is undeniably a low bar. However, it is still a bar. It still requires that claims be raised on direct appeal if they are able to be raised on direct appeal. This claim unquestionably could have been raised on direct appeal. It is a claim of trial counsel's ineffectiveness. It is of the record. It is part of the record, as we could all agree. And it is something that could have been raised. And allowing, you know, defendant argues, well, we should, you know, have an implicit argument kind of involved in every claim that appellate counsel, it's kind of a two for one or buy one get one free that you get to have the appellate counsel argument included for free. Well, that would simply, you know, there would be no, you know, pleading standard if every implicit argument was allowed in a post-conviction hearing act. There's, you know, again, the defendant's argument fails on its merits, but the people also strongly argue that it should be considered forfeited. The people realize that forfeiture is not a limitation on your honors. However, the people wish you to consider these policy considerations. If there are no other questions I can answer for Justice Jorgensen or your honors, might I conclude? Justice Jorgensen, I'll let you go first. I have no additional questions. Your honors, again, defendant's raising his appellate counsel claim for the first time on appeal from the dismissal of the petition. Therefore, even the trial court, the post-conviction court had no ability to consider it. And there is no arguable claim that Mr. Moxinger was accountable for Mr. Clark's murder. He did not participate in the planning or the commission. And the people ask that you consider the case. All right. Ms. Donahoe, you may reply if you wish to. Thank you, your honor. I'd like to make a few points. I wanted to refer back to People v. Quezada and I apologize for not specifically citing it in the case. I thought that the reply brief responded to the points. And I wanted to just get again that the state cited that for the idea that Mr. Moxinger was nearly present, which he certainly was not just nearly present as he was there to facilitate a drug transaction, knowing that Mr. Gerken brought a weapon. So even if this court doesn't find that Mr. Moxinger was arguably involved in the planning or commission of the actual shooting death of Mr. Clark, another charge was aggravated discharge of a weapon. Isn't it difficult to say that he was involved in the commission when the defendant raises self-defense? How do you get around that? Well, Mr. Gerken argued self-defense. He said, according to his testimony, that he brought the weapon for protection purposes and that he ended up using it. To protect himself and acted in self-defense. But for purposes of evaluating Mr. Moxinger's testimony, he was arguing the facts that Mr. Gerken committed first-degree murder. That was the underpinning of the state's entire case. So Mr. Moxinger was with him and he was there. The state at one point said that he needed to be involved in the commission. Mr. Moxinger was definitely involved in everything leading Mr. Gerken up to Mr. Clark's doorway. And he is arguably, again, just arguably involved in the commission of the offense. He lied repeatedly to protect himself and to avoid criminal liability, including potentially responsibility for Mr. Clark's testimony, to avoid criminal responsibility for the drug transaction. And the accomplice witness instruction would have been consistent with the defense and it would have been a tool that required the jury not to view his testimony with suspicion, regardless of any argument made by defense counsel. Well, the jury did get the general instruction about how to view a witness testimony and things of that nature. They weren't totally without that type of instruction, were they? They did receive those instructions, but getting this instruction that requires, that includes very strong language, requiring the jury to view his testimony with suspicion and caution. And having that judicial infirmature on the instructions and not just hearing defense counsel call Mr. Moxinger an opportunist and a liar. That is arguably something that would have made a difference at trial. And then as to forfeiture, this isn't a case where we're trying to take a second stab at a direct appeal. Mr. Moxinger very clearly stated this claim about trial counsel's ineffectiveness in failing to get this jury instruction. And a recent unpublished decision from another panel of this court, People v. Chrisman, found that the argument wasn't forfeited. And the state's cases are really different situations where on appeal from the summary dismissal, the defense tried to raise a really unrelated claim, like in People v. Jones. And that case on appeal from a PC dismissal, the defense tried to raise a really unrelated claim, like in People v. Jones. And that case on appeal from a PC dismissal, the defense tried to raise an improper admonishments issue that wasn't presented in any form in the petition and asked to review it as fundamental fairness. And that's not what's happening here. And also, it's not really accurate to say that this unquestionably could have been raised on direct appeal because Mr. Grickin actually attached some police reports to his petition to support this claim. And under Illinois law, it's not always clear what claims can be raised on a direct appeal versus a collateral attack. And he attached these police reports related to interviews that Mr. Moxinger and other witnesses had about Mr. Moxinger's version of events and his potential criminal liability. And it's possible that at second stage, this could get developed into an issue of straight trial counsel ineffectiveness depending on what investigation was done. And that's something that the defense might uncover. Moxinger wasn't given immunity or leniency, wasn't granted either of those, wasn't he? He was given, he pled guilty in exchange for probation. He was given a deal, but not immunity. He was given consideration. He escaped, as defense counsel argued, he miraculously ended up on this journey from lying to execution. He was able to get everybody to the 911 call to the police station, to going to court and avoiding prison time, despite having responsibility for setting up a transaction that resulted in somebody's death. So, we're not asking for a bright line rule here that says that a pro se petitioner never has to allege appellate counsel's ineffectiveness, but in this case, the crux of his claim is there. And it requires a high level of legal knowledge to be able to do that. So, we're asking this court to frame it as an issue of appellate counsel's ineffectiveness, and that's something that can be remedied at the second stage. So, we're asking this court to reverse the summary dismissal and remand for second stage proceedings. Thank you. Thank you, both counsel, for your participation today, and we will take this matter under advisement. We will issue a decision as soon as possible, and we are now going to stand adjourned.